Good morning, Your Honors. Philip Keith appearing for the plaintiff and appellant, Andy Saberi. This is an appeal from the summary judgment granted by the district court on Mr. Saberi's claims for fraud and violation of PMPA, Petroleum Law. That's the only cause of action which has not been disposed of. Right. And the station was acquired by Mr. Saberi, ultimately from shell. He purchased the property. The dispute goes back to what happened in 2001 when Mr. Saberi renewed his existing franchise relationship with shell. He would have liked to have bought it at 2001 prices rather than 2004 prices. He would have. Like anyone. Yes, sir. And specifically with respect to this station, that at the time he was offered the opportunity of renewing as he was required and as shell was required to do in 2001, there were discussions that Mr. Saberi put forth in his declaration that he would be able to buy the station within 90 to 120 days. And your appeal in front of us depends on a comma. Yes, Your Honor. It's because when you look at the what the district court found when she interpreted the purchase of the station as initiating the fraud claim, that the promise to sell the station to Mr. Saberi was already guaranteed to Mr. Saberi under the PMPA. Whenever shell wanted to terminate or not renew the station arrangement, they were obligated under the PMPA to offer him the station. That was a guarantee contingent upon shell getting out of business with respect to that station. That's to say that statute comes into effect only when shell decides to get rid of the station. Otherwise, it didn't need to sell it to him. Right. They did not have to sell it to him at any particular point in time until they decided to. Or never. Or never. If they wanted to keep the station forever, they could keep the station forever. Yes. But I think the circumstances, as Mr. Saberi stated in his declaration, that there were operating losses going on with respect to the station, that the parties knew that this was not a viable long-term station as a branded shell station. Yes, but doesn't that turn on the part of his declaration and how you read that if he executed the agreements within 90 to 120 days, the defendant would sell me the subject service station? And there's two commas there, and as I read Judge Patel's decision, she just eliminated that first comma and interpreted to read, well, they could sell it at any time. So what do we do with that? I think the issue is what? At this level of review. I think there's an issue of fact, because the problem is given the guarantee if the station is going to be sold, there's no point in making that promise. That's not my point. We have to deal with his declaration and those specific words. His explanation of losing money is interesting, but it has to do with what he said they promised him. This is the promissory fraud we're talking about. And he's saying it was an inducement to enter into the lease. What if we interpret those words as meaning exactly what he said, i.e., that if you sign this lease, within 90 to 120 days we'll sell you the station? What if we do that? Now, do we have to say that Judge Patel was erroneous in her determination and that would be a disputed issue of fact, that we say we'd have to send it back? Is that what we would do? I think so, because there's no dispute. Michelle never puts on the record a denial of any of the discussions in 2001. It's just blind. There's no response from Michelle as to what happened in 2001. Well, isn't there at least one very good reason for that? In your complaint, or maybe it was an amended complaint, you pleaded that the fraud was that Michelle had refused to sell the station at a fair market value. The first mention of this 90 to 120-day condition of sale, which you allege, came up in the response of the nonmoving party to the motion for summary judgment. It was a total variance of the fraud pleaded in the First Amendment complaint. As such, it seems to me that under Rule 9, which regulates fraud pleading, you did not give notice to Michelle of this late-blooming promissory fraud. How do you deal with that? Shouldn't you have amended your complaint under Rule 15 and stated the fraud that you were now using rather than the fraud you had alleged? You have to look at the circumstances of how the complaints came about and what was occurring. When the first complaint was filed, that's in May of 2004. Without a mention of the 90 to 120 days. Because Michelle had not, at that point in time, done anything. Mr. Seberry's franchise was expiring the end of July. May is within that 90-day window where they have to give you 90 days' notice of termination or nonrenewal. So at that point in time, Michelle, late summer, late spring, early summer 2004, Michelle is starting to market the station. Doesn't tell Mr. Seberry. Doesn't offer him the opportunity to buy it. Doesn't offer him to, because they had no offer at that point. At that time, according to your later allegation of fraud, Michelle was already three years in default. And not a word of that in your complaint. Not a letter sent to Michelle in three years saying you are not in performance of your promises. You promised to sell it to us within 90 and 120 days. The first 90 and 120 days, those words, those numbers see light only in response to the motion of summary judgment. And you do not amend your complaint under 15 to state the new and particular grounds of fraud. Don't you see something wrong with that? It was, I think, in the context of the way the motion was set. Now, secondly, take a look at Mr. Seberry's declaration. If I executed the franchise agreement, comma, within 90 to 120 days, comma, defendant would sell me the subject. If you take that textually, you have a dependent clause which modifies one of two verbs. Right? The antecedent or the successor. Anybody would tell you, if they go back to seventh grade grammar, that that modifies the antecedent verb. But Mr. Seberry's statement, I mean. But his claim is that. The question is, would a reasonable juror find, based on this, that the 90 to 100 days means that within 90 to 100 days of selling, of signing a three year lease, Shell would sell the station. Think about that just a second. You in your office get a three year lease for your office and you say, I can buy this in a condominium in 90 to 120 days. Isn't that somewhat inconsistent with the circumstances? No, because Shell wanted to keep the station going while it determined what, you know, this, these. For 90 to 120 days? They wanted to keep it. They had no downside risk of keeping him in possession. We're on summary judgment. You're arguing inferences. You're arguing other facts. And the other thing that impresses me from what Judge Baez got you is the fact that you argued forcefully when we began that the reason your client was all concerned about this, because he was losing money. But he sat there for three years losing more money and didn't do a damn thing about the fact that Shell had not offered him to sell the station, that he didn't come through within 90 to 120 days. Doesn't that kind of put? What do we do with all these facts on a summary judgment motion? He did put in his declaration the statements that those promises were repeated by the Shell representatives after the time. I know. But as Baez said, you sat there for three years losing money but didn't worry about buying the station. Given the long-term relationship between the parties, there was, you know, the evidence is that they continued to discuss this and it was finally brought to a head when Shell goes around, Mr. Seberry. Is that in their record, the fact that they continued to discuss it? I believe Mr. Seberry says in his declaration that there were repeated promises to sell him the station. I've got a question, which is, I read the exchange in open court where Judge Patel is clearly indicating a problem with the comma placement. It would have been at least a possible thing to do to say, you know, I recognize the ambiguity here. It's the Scrivener's error. He misplaced the comma. Let me get a proper affidavit from Mr. Seberry that puts the comma in the right place so there's no ambiguity as to what he meant. Why didn't you ask to do that? I think he did. Pardon me? You what? I was not counsel at trial. I know. I was the attorney that was arguing the matter, said this is how the language was to be interpreted. I know. I understand. That's exactly what I'm saying. But it would have been easier if he had requested from the jury. Well, I'm asking why he didn't do it. I mean, that gives rise to me to some sense of, you know, they're just trying to take advantage of the ambiguity, but you're not interested in clearing it up. I don't think that – I think given the state of the argument being presented and where it was before Judge Patel, there was – it was probably not going to be a worthwhile effort. Maybe. But I agree. I mean, it would have been – And, of course, there's no dispute that what – there was no enforceable contract to sell, even if he's right as to the commonplace – commonplacement. That is to say, statute of fraud says you need a written contract. He doesn't have one, correct? That's correct. So he never did have an enforceable contract to sell, even on his theory. And his claim is limited to the damages caused by not selling it. Gotcha. Okay. I think we have your argument in the hand. Let's hear from the other side. And you're over time, but we'll give you a minute for rebuttal. Thank you. I think that we have covered most of the basis in our papers, and I stand ready to answer any questions you have. The only comment I would make is that if you total the alleged losses, they were over $410,000. And it's over a period of three years. And as Judge Patel noted, there was never one letter, never a single letter that did not cover anything in the declaration. And I looked again when counsel said he thought that Mr. Saberi had declared, in fact, that there had been repeated promises, and he hadn't. And, in fact, Judge Patel noted that in the hearing as well. Let me clarify, if I heard you correctly. I didn't think I saw it either. Nowhere in the record does it show that during that period between the alleged promises to sell within 90 to 120 days of the execution until the time that she'll engage toward the end of the lease to sell the property, never were there further discussions or demands made by Saberi like, where's my sale? That's correct. And I believe that is one of the reasons that, to quote Judge Patel, she thought that this was an afterthought. In fact, the original complaint was filed, I believe, in June, early June. And then the amended complaint, all it did was it added a few extra facts as to who it was who allegedly made the promise. So even in amending, and this is, again, after being put on notice of what our position was going to be, there was no indication that there had been, you know, these years of promises or the content of the promise being different than what is pleaded in the two complaints. May I ask you a question? I think that Mr. Keith didn't have time to address this. What is your view as to whether the fraud cause of action is preempted by the PMPA? I think that it is under the terms of the statutes. I don't think any of the cases that have been cited, obviously, are on point because they either deal with a new franchise agreement, and ours is very different because ours is a renewal. There's no question. Counsel admitted this morning it was a renewal situation, whereas Pride, which is the Ninth Circuit decision, dealt with suing Exxon for alleged misrepresentations in inducing the plaintiff to enter into a contract or a franchise agreement with Texaco. So that was a new franchise relationship. What was the relationship with Exxon at that time? Exxon had terminated. This had been an Exxon dealer. Exxon decided to exchange properties with Texaco. And so they had to terminate theirs. Texaco then came in and offered the plaintiff a franchise, which they accepted. And in that case, what the Ninth Circuit said was, well, but they're suing you for misrepresentations in inducing them into entering into a new franchise, which would have been with a different company. Help me where I think maybe I'm wrong then or misconceived here. PMPA applies only to termination of a franchise or to the non-renewal of a franchise. Correct. So what is this case? This is a renewal or a non-renewal. Excuse me. Non-renewal. Non-renewal. This is a renewal. So it doesn't seem though PMPA would apply. Let me, I've misstated. There's two points in time. At the point in time where the alleged fraud is said to have taken place, which is at the time that he's signing the renewal, okay, in 2001. And the old lease is still in effect. And the old lease is still in effect. Okay. So that's a renewal situation. And so that's why I say it falls within the PMPA. PMPA applies to non-renewal. Terminations are non-renewal. I don't think. He's saying I wouldn't have renewed but for your alleged inducement or promises that induced me into doing this. And I'm saying that falls within the ambit of the PMPA. You can't. Are you saying that a franchisee who's about to abandon his franchise and is induced by a franchisor to renew the franchise with a secret side deal will slip you $100,000 if you do this for us, right? Let's suppose those facts are there. That would not be promissory fraud because there can be no terms other than the PMPA terms? You can't contradict. I believe that the preemption provision is quite clear. You can't contradict or basically the State is precluded by the preemption. That would be correct in your hypothetical. And there would be a remedy, but it would be the remedy under the PMPA, which is not ‑‑ I mean, I think there's treble damages at one point, but I may have that mistaken with the California one, so I will draw that comment. I mean, but the damages would be and the remedy would be under the PMPA. It's sort of like rent control, right? I'm from Los Angeles. We don't have rent control. Kennedy, are you saying that there was no threat of termination or nonrenewal being involved here? In other words, Cell did not say we're going to terminate you or we're not going to renew you, so it was just a renewal process. It is a renewal process. So how can that be PMPA? How does PMPA apply in a renewal situation? Well, because he's saying I wouldn't have renewed but for your promise. And so I think he's saying it would have been a nonrenewal, I wouldn't have renewed. And I think that the scope ‑‑ But that's his action. PMPA goes to the action of Cell in failure to renew or termination. He ‑‑ that's his intention. Cell didn't do anything in that regard. I understand that. And when the plaintiffs sought to come within the ambit of consumers, which is the Sixth Circuit decision, what we did was we came back and said, well, it is distinguishable and we look to Pride. So maybe we're getting off point, but it seems to me that it is his claim and he is saying this is why it doesn't apply and we're saying it does. And I think that the scope is ‑‑ What do we do with our Pride case? It's distinguishable. And how is it distinguishable? Well, there you have two ‑‑ you do have a new franchise agreement because it's a new franchise relationship with Texaco. And he sued Exxon, the old franchisor. So it is distinguishable. It just doesn't apply. So if we're renewing between the same franchisor ‑‑ It's the same relationship. Excuse me. Then what? Well, if you have the same relationship, then I think it clearly falls within the PMPA. Why? Because it's intended to govern terminations or nonrenewals and to protect the franchisee. Even though the franchisee is causing the nonrenewal by his intention that he will not renew unless I get this provision to buy the station. I hear your point. But I don't read it that narrowly. I think that the legislative history was intended to have it read more broadly than that. I understand that reasonable minds could differ on that. Well, I don't know if it's a ‑‑ I'm just trying to sort out my thoughts. Because it seemed to me that PMPA is aimed at what the franchisor is doing relative to the franchise. Protection goes to the franchisee. But if the franchisee is jockeying the franchisor, I don't see how PMPA comes in. I mean, there's nobody who says it's going to protect the franchisor. I think that's probably why Judge Patel didn't rely on preemption. As you'll see in the transcript, she really didn't want to talk about preemption. If we go the route that Saberi's arguing, we're going to run right into preemption and we'd have to decide. That's true. Okay. Thank you very much. Would you like a minute? I'll stick to that, Your Honor. With respect to the declaration, Mr. Saberi did say that identifying two shell people, Redis and Donald Mayday, repeated these promises. That's the record at 327. Well, repeatedly promised when? It comes after the sentence that in reliance on signing within. We have inferences now on summary judgment. We have to determine those facts. Is that it? Well, it's in his declaration that after he signed the declaration, after he signed the lease and the supply agreement, the promises to sell him the station were repeated. That's what's in the declaration. I just want to clarify that there were subsequent discussions by shell representatives with Mr. Saberi about the sale of the station. That's page 327 of the record. And on the preemption, I think the issue is it's not a non-renewal termination situation. Can I clarify that, please, because I'm a little bit lost. Help me here. At what paragraph in his declaration does he say there was these continuing promises? Paragraph 6, starting at line 13 through 16. I don't see where it says they continue to make the promises. In reliance upon this fraudulent promise, I executed the agreements. Thereafter, Redis and Donald Mayday repeated these promises. Ah, missed that. Okay. Okay. Thank you very much. Thank you. The case of Saberi v. Shell Oil Products is now submitted for decision. The case of the missing comma. The next case on the argument calendar is Gomez-Villagrana v. Gonzalez.
judges: Brunetti, W. Fletcher, Bea